Filed 6/30/14  P. v. Hatton CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KYLE ANDREW HATTON,<br><br>Defendant and Appellant. | F065019<br><br>(Super. Ct. No. 9675)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Mariposa County.  Harry N. Papadakis, Judge.  (Retired Judge of the Fresno Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Susan K. Shaler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Kyle Hatton was convicted by jury of committing lewd acts upon a child under the age of 14 years in violation of Penal Code section 288, subdivision (a).  The victim,

whom we refer to as Katie Doe, was his niece.  Hatton was sentenced to eight years in prison.

This appeal challenges several evidentiary rulings made during the course of trial that were ultimately subject to the trial court's discretion under Evidence Code section 352.[1]  In his primary argument, Hatton complains certain background information about the victim's prior sexual experiences should have been admitted despite the restrictions of sections 782 and 1103.  He further contends the trial court erred by allowing the prosecution to present expert testimony on the topic of "child sexual abuse accommodation syndrome," and admitting sexual misconduct propensity evidence under section 1108.  Additional arguments for reversal are made on the grounds of instructional, constitutional, and cumulative error.

Aside from correctly noting the miscalculation of an assessment imposed as part of his sentence, we find appellant's assertions of error to be unpersuasive and lacking in merit.  The trial court's imposition of a $50 assessment pursuant to Government Code section 70373 was not authorized by law, and must be increased to the sum of $150.  The judgment is otherwise affirmed.

### FACTUAL AND PROCEDURAL HISTORY

Hatton is Katie Doe's uncle on her mother's side.  Hatton and Katie's mother are half-siblings; they share the same mother but have different fathers.  Hatton's parents, with whom he lived during the relevant time period, are Katie's grandparents.

Hatton is older than Katie by approximately nine years and six months.  In April 2011, when Katie was 11 years old, she informed her mother that Hatton had touched her inappropriately on several occasions.  Hatton was 21 years old when Katie came forward with her allegations.

---

[1] All further statutory references are to the Evidence Code unless otherwise specified.

2.

The Mariposa County District Attorney subsequently charged Hatton by amended information with eight counts of committing lewd or lascivious acts upon a child under the age of 14. (Pen. Code, § 288, subd. (a).) Each count corresponded to certain time periods, locations, and conduct by Hatton: February 13-16, 2009, placing his penis between Katie's buttocks at a hotel at Disneyland (Count 1); August 10, 2008 – August 9, 2010, Katie licking his penis in the pool house at his residence (Count 2); June 8, 2008 – March 27, 2011, Katie rubbing his penis with her hand in a hot tub at his residence (Count 3); June 8, 2008 – March 27, 2011, laying on top of Katie and placing his penis between her buttocks at his residence (Count 4); June 8, 2008 – March 27, 2011, Katie rubbing his penis with her hand while on a bed at his residence with nobody else in the room (Count 5); June 8, 2008 – March 27, 2011, Katie rubbing his penis with her hand while on a bed at his residence with at least one of Katie's brothers in the room (Count 6); June 8, 2008 – March 27, 2011, Katie rubbing his penis with her hand in his bedroom at his residence (Count 7); and March 25, 2011 – March 27, 2011, Katie rubbing his penis in "Grandpa's shop" at his residence (Count 8). Each count was accompanied by enhancement allegations made pursuant to Penal Code section 1203.066, subdivision (a)(8), for substantial sexual conduct with a victim under 14 years of age. The charges were tried before a jury in February and March 2012.

**Prosecution Case**

Katie testified as the complaining witness for the prosecution. Her testimony described numerous acts of molestation committed against her by Hatton from approximately 2008 through 2011. The incidents frequently occurred when she and her family were visiting Hatton's residence, i.e., her grandparents' home. Katie's grandparents lived in a large, two-level house located on a sizable property which also had a cabin, a pool, a pool house, hot tub/Jacuzzi, and other amenities. She and her brothers enjoyed visiting the home and often spent time with Hatton while they were there.

The earliest incident Katie could remember happened in 2008 when she was eight years old. On that occasion, Hatton touched her crotch over her clothing under the pretext of playing some type of game. Although she was unable to pinpoint dates, she was fairly confident the initial event happened before Hatton graduated high school. Hatton was involved in a car accident on June 3, 2008, which left him disfigured. Katie was able to estimate certain time periods based on whether or not she remembered Hatton's face being disfigured at the time of the abuse.

The general pattern of Hatton's misconduct involved him soliciting Katie to stimulate his penis with her hands. He would expose himself, begin stroking his penis, and then ask her to "help him." When she mimicked the behavior with her own hands, he would encourage her to continue until he reached ejaculation. Hatton never touched Katie's vagina, but occasionally squeezed her buttocks while she performed his requested acts. These incidents were short in duration, usually lasting only one or two minutes, but happened several times over a period of three to four years.

Katie testified to two instances where Hatton placed his penis between her "butt cheeks." This occurred once in a bathroom at his house and once in a hotel at Disneyland when Katie was sleeping in the same room as Hatton and her grandparents. According to her testimony, Hatton had virtually no fear of getting caught and would sometimes even solicit her while her brothers were in the same room playing video games. Notwithstanding the brazen behavior, Hatton told Katie things to the effect of, "This is our little secret." At first she did not know the conduct was wrong, but even after she came to appreciate the nature of the abuse she still kept it to herself.

On the evening of April 29, 2011, before a planned family visit to her grandparents' house, Katie told her mother she did not want to go on the trip and that she needed to tell her something about her uncle. Not wanting to discuss the matter out loud, Katie asked if she could type the information on her mother's phone. When she did so, the message read, "He makes me touch his privet spot and I fell really uncofturable but

4.

he forces me to and I'm scared to go up there." (Sic)  When her mother asked when and how many times this had happened, Katie typed, "About a year or two but I was to scared to tell u and he told me not to tell anyone." (Sic)

Katie made further disclosures on May 7, 2011, preferring again to use a note-taking application on her mother's phone rather than to speak the words out loud.  She typed, "He makes me touch his privet spot and move it up and down until stuff comes out of his privet spot." (Sic)  She also wrote, "He put it up my butt like 2 or 3 times" and "[He] told me to suck it[.] I quickly touched it with my tounge no longer than 2 seconds[,] than he said suck it and I said no." (Sic)

Testimony was provided by the victim's mother, father, and older brother.  None of these family members witnessed inappropriate behavior by Hatton towards Katie.  However, Katie's 16-year-old brother testified to remembering two or three incidents that occurred approximately eight years earlier when Hatton touched him inappropriately and encouraged him to engage in sexual behavior.  (See discussion, *infra*.)

Expert witness testimony was presented on the topic of child sexual abuse accommodation syndrome. (See discussion, *infra*.)  This was followed by the testimony of a registered nurse who performed a sexual assault response team (SART) examination on Katie in May 2011.  The results of the examination were normal, but the nurse found a scar on Katie's anus which led her to document "questionable anal penetration."  The nurse explained the scar could have been caused by a number of different things, including a large stool, a fall, or penetration by an object.

A letter written to Hatton by his mother after his arrest was admitted for purposes of impeachment when she denied on cross-examination that Hatton had confessed to the allegations of abuse.  The letter read, in pertinent part, "Dear Son … I love you.  I know that you are ashamed and embarrassed for your actions.  Somehow you need to make things right.  I do not understand how you could let this happen.  We all have choices, right or <u>wrong</u>.  Your niece looked up to you and trusted you.  You let her down.  Your

5.

sister adores you.  It will take a long time to earn that trust again.  This is devastating to a lot of people[;] Katie, her dad & mom[,] you and dad and I.  We love you no matter what and are here to help you.  It's time for you to make the right choices and get your life together…."  (Original emphasis)

**Defense Case**

The defense strategy focused on the following arguments and theories: (1) Katie was a liar, (2) Katie falsely accused Hatton in order to avoid having to face her grandparents after she had broken a pipe at their home during a previous visit, and (3) Katie made some type of sexual advance towards Hatton, was rejected by him, and then accused him of similar behavior to avoid getting in trouble.

Hatton testified in his own defense and unequivocally denied Katie's allegations.  He likewise denied being attracted to children.  Defense counsel elicited testimony regarding his sexual relations with long-term girlfriends, including a young woman who lived with him at his parent's home during some of the relevant time periods.

Hatton further testified to an incident that allegedly occurred in March 2011, approximately one month before Katie revealed the abuse to her mother.  Katie and her family were staying at the Hatton's home when it happened.  Hatton explained: "I went to bed and Katie kept – came into my room sometime in the middle of the night, and she reached under the covers and touched over my underwear on my genitals…. At that point I, like, pushed on her because I – I didn't know what was going on.  And I said, 'Get out of here.'  And she – she just looked at me funny and went outside…."  Hatton refrained from sharing this story with anyone else until after his arrest because he did not want to embarrass his niece.

Hatton's mother testified on his behalf.  She denied certain testimony of the prosecution witnesses and claimed the allegations were impossible because Katie's family did not visit nearly as often as they claimed, and because Hatton was never alone with Katie.  Ten character witnesses attested to Hatton's honesty and other good

qualities.  The defense also called three teenage boys who lived in Katie's neighborhood, and elicited opinions from them regarding her allegedly poor credibility and negative attributes.  (See discussion *infra*.)

**Verdict and Sentencing**

The jury deadlocked on Count 1 (the Disneyland incident), but convicted Hatton on Counts 2 through 8.  True findings were returned on the substantial sexual conduct allegations for each conviction.  Hatton was found to have been over the age of 18 at the time of the offenses as to Counts 3, 5, 6, 7 and 8, but not Counts 2 and 4.  The prosecution subsequently dismissed Counts 1, 2 and 4.

Hatton was sentenced to a total term of eight years in prison, consisting of a six-year term for Count 3, a consecutive two-year term for Count 5, and concurrent six-year terms for each of Counts 6, 7, and 8.  Fines and fees were also imposed.  A timely notice of appeal was filed May 24, 2012.

## DISCUSSION

**Evidence of Katie's Prior Sexual Behavior**

Hatton alleges the trial court erred by excluding evidence that Katie had once falsely accused a child of inappropriate sexual conduct.  His opening brief states, "[Appellant] sought to introduce evidence that Katie had groped Jesse [R.] without his consent, and after he rebuffed her, falsely accused him of inappropriately touching her." No record citation is provided for this statement.  Hatton goes on to assert, over the course of 15 pages, various claims of state law error and violations of his federal constitutional rights, all under the rubric of wrongfully excluded "false accusation" evidence.

We recognize that the evidentiary dispute to which Hatton refers arose in a rather convoluted manner at trial.  The relevant facts are not easily untangled from the voluminous reporter's transcript.  However, whether by design or innocent mistake, appellant's arguments are based on a fundamental mischaracterization of the record.

7.

Hatton's trial counsel did attempt to introduce evidence that Katie made inappropriate and unwanted sexual contact with a boy named Jesse, but that was the extent of the allegation. At no time did the defense argue or make an offer of proof that Katie falsely accused Jesse of engaging in sexual behavior towards her. Given appellant's extensive argument on this imaginary premise, it is appropriate for us to discuss the pertinent background information in detail. We will then review the applicable law and explain why Hatton's legal claims fail.

Background

Katie was the first witness to testify at trial. During cross-examination, defense counsel inquired of her prior interactions with four boys from her neighborhood. "Aric," "A.J.," "Jesse," and "Rylan" lived together in a foster home near Katie's residence. A.J. and Rylan were both one year older than Katie. Aric and Jesse were senior to her by approximately four years.

Defense counsel began by asking Katie about Rylan. She testified that she "kind of liked him" for a brief period of time, but also said, "I barely know him." She was asked if they had ever kissed. Katie explained Rylan tried to kiss her once, and their lips touched, but she quickly pulled away. She denied asking A.J. to leave the room so she and Rylan could be alone. The momentary kiss was the only intimate contact she ever had with him.

When the topic of cross-examination shifted to the boy named Aric, Katie denied knowing him. She later retreated from that position, and admitted Aric had shown her his penis on one occasion. As the questioning intensified, Katie was asked if she reported different versions of the incident to her parents and if her father confronted Aric about sending her inappropriate text messages. She denied being able to recall further details of the incident.

Jesse was once good friends with Katie and her brothers. Her parents even considered adopting him. According to Katie, Jesse changed over time and her family

8.

eventually disassociated themselves from him. In her words, "he turned into a punk kid … I believe he's been arrested and he stole money from kids, and so we just stopped hanging out with him and we never really talked to him again."

Defense counsel asked Katie about two specific allegations concerning Jesse, both of which she denied. The exchange relating to the first allegation was as follows:

"Counsel:    You were very comfortable being around Jesse [R.]; isn't that true?

"Katie:    Yeah.

"Counsel:    And you at some point – you actually touched him in an inappropriate way; isn't that right?

"Katie:    No.

"Counsel:    You were about ten years old [meaning Jesse would have been about 14]. You actually touched him several times; isn't that right?

"Katie:    No.

"Counsel:    Didn't you at one point ask him if you could touch his penis?

"Katie:    No.

"Counsel:    That never happened?

"Katie:    No, it never happened.

"Counsel:    You never touched his penis one or more times?

"Katie:    Never touched it one or more times – never once touched it."

Regarding the second allegation, counsel asked, "Do you recall an incident where you went to your father and you told your father that [Jesse] had pushed you, [when] you, in fact, had been the one that pushed or hit him; isn't that right?" Katie responded, "No." Hatton's attorney repeated the allegation, and Katie again denied it.

The prosecution was incensed by opposing counsel's cross-examination on these topics, and informed the court it had been blindsided by the purported accusations of Aric, Jesse, and the other two boys. Hatton's attorney claimed he was under no obligation to provide advance notice or disclosure of his "impeachment" evidence. The

9.

trial court indicated the matter would be resolved at a later time, but made the following comments for the record: "The Court's real concern at this point is that you made the statement that there were no [adverse witness] statements. There were no interviews, and all you had was a list of witnesses that would testify to your client's character for truthfulness. I don't want to say that that amounted to a misrepresentation to the Court at this time. More appropriately, you should have told the Court that [you] have information that might be used for impeachment. To tell the Court that you had no statements, that's very disturbing."

At other times during its case-in-chief, outside the presence of the jury, the prosecution objected to Hatton's failure to comply with the procedural requirements of section 782 regarding the victim's prior sexual history. The prosecution also made a preemptive effort to mitigate the impact of Hatton's undisclosed evidence. Katie was excused from the witness stand on February 28, 2012, but was recalled three days later after it became apparent that the anticipated testimony of the foster children was a significant component of Hatton's defense strategy.

On further direct examination, Katie admitted to being less than truthful in her testimony about Rylan. Whereas she had originally testified to barely knowing him, in reality, she once considered him to be her boyfriend. They kissed, and she did not pull away, though the only other affectionate behavior between them involved "playing footsies" with their feet. Her testimony about the kiss was essentially the continuation of a lie she had told her mother. When asked why she lied, Katie explained, "Because I can't -- didn't want to get in trouble. I wasn't allowed to kiss. I'm still not allowed to kiss."

Katie also withheld information about Aric. Aric had not merely shown her his penis; Katie actually touched it upon his request. The incident was consensual insofar as Katie had not been forced to do anything against her will. To the best of her recollection, she and Aric also exchanged text messages which included statements by him about his

10.

penis.  Katie later confessed a half-true version of the events to her mother.  In other words, she told her mother Aric exposed himself and that she received inappropriate text messages, but omitted the fact that she touched Aric's genitals.

On March 6, 2012, at the start of the second day of the defense case-in-chief, the trial court held a hearing to determine the admissibility of certain evidence proffered by both sides, including the proposed testimony of A.J., Aric, Jesse, and Rylan.  The relevant exchange regarding the offer of proof as to Jesse is reproduced here with bracketed explanations for some of the statements made by Hatton's attorney.

"Defense Counsel:   Your Honor, [Jesse] would indicate that on several occasions, about five times, that Katie would 'grab his dick' .… And that this happened when he was – he was in a bedroom with her playing video games, and that each time she would ask him if she could grab his dick.  And this happened when he was either 14 or 15 and she was 9 or 10.  That also –

"Trial Court:   Let me interrupt you.  How do you get around the fact that you can't bring in her other sexual activity?

"Prosecutor:   Well, there's a procedure for that, and it's [section] 782.

"Trial Court:   Hold on.  Let him answer the question.  How do you do that?  How does that impeach?

"Defense Counsel:   Well, the first thing, Judge, is it is impeachment because it would contradict what she said [i.e., Katie's testimony denying that she ever touched Jesse's penis].  Now, if what she did now is consistent under either – any number of these – 1101, 1103 and 1105 of the evidence code because what we're going to be indicating is that Katie [Doe] took – and the real reason this is relevant is because this is the identical behavior that Katie engaged in with Kyle Hatton

11.

[i.e., allegedly sneaking into his room in the middle of the night and touching his penis while he was asleep]. She touched him inappropriately without his permission and he didn't want it.

And then – so then – and part of our position is as to what happened when she later made these disclosures [i.e., allegations against Hatton] because she was afraid that she was going to get yelled at or that she would expose her behavior. Now, the reason that's relevant, Judge, is because she had done this on other occasions with other young men [referring to allegedly groping the genitals of Aric and Jesse]. So what it shows – again, under those evidence code sections – that she's engaged in a pattern of like behavior. That whenever she's either confronted with it or is fearful of it[,] that she engages in a falsehood and makes false accusations [referring *only* to the alleged false accusations of sexual behavior by Aric and Kyle Hatton. Theoretically, counsel could have intended his statement to also include the allegation that Katie falsely accused Jesse of *nonsexual* behavior in the form of pushing her at the park, but this is extremely doubtful since such a connection was never otherwise alleged or argued].

So – and this is relevant and the time frame is relevant because this would be during the time frame that she's alleging that Kyle Hatton is engaging in these bad acts. So it directly impeaches her on a number of levels … so that's where it comes in.

12.

"Trial Court: To begin with, it's collateral impeachment, and case law and statutory law is very clear that you can't bring in her prior sexual acts. Some of this is getting in because testimony was allowed regarding some accusations. She made some accusations, and there was evidence that that never occurred. That goes to the veracity of that accusation. But we're not going to go into any other alleged sexual acts that she might have engaged in….

"Prosecutor: Not without compliance with 782…."

A.J., Aric, and Jesse were subsequently examined outside the presence of the jury pursuant to section 402. When Jesse was asked if Katie had ever grabbed his penis, he responded affirmatively. He was also questioned about false accusations, but the only allegations he made in that regard pertained to the "pushing" incident referenced during Katie's cross-examination. The witness was examined on a variety of other topics as well, and no attempt was made to draw a connection between the two particular areas of inquiry (i.e., the touching and the false accusation). If Hatton's trial counsel believed there was evidence that Katie falsely accused Jesse of inappropriate sexual behavior, he made no mention of it during the section 402 hearing or at any other time.

The three witnesses were permitted to testify before the jury, but the defense was prohibited from eliciting the allegation that Katie touched Jesse's penis. Rylan was either unavailable or simply not called in light of the court's conclusion that his testimony would have no impeachment value since Katie had already admitted the truth about their relationship and the infamous kiss. A.J.'s testimony was brief, consisting almost entirely of his opinion that Katie "lies a lot."

Aric testified to remembering an incident that happened when he was 13 or 14 years old [meaning Katie would have been 9 or 10] where Katie "caressed" his leg with her hand while they were playing video games, and in doing so came into contact with

13.

his penis. He reacted by saying "What's your problem?" and cursing at her. Katie, in response, "got all mad and stormed out of the room." Later that day, her father angrily confronted him and said, "Why would you tell my daughter the size of your penis?" Aric denied exposing himself to Katie, sending her text messages about his penis, or otherwise engaging in sexually inappropriate behavior towards her.

When Jesse took the stand, he offered the opinion that Katie "doesn't really tell the truth that much." He substantiated this statement by providing the following account of an incident that occurred on an unspecified date: "She pushed me and went to her dad and said I pushed her." Hatton's attorney asked, "Did you, in fact, push her?" Jesse, replied, "No." The witness then explained how he saw Katie run to her dad and relay the false accusation, which prompted her father to walk over to him and make a threatening gesture with his fist.

After the jury returned its verdict, Hatton's lawyer filed a written motion for a new trial. The motion argued the jury should have been allowed to hear Jesse's allegation that Katie touched his penis because the conduct was similar to her alleged touching of Hatton "in a sexually inappropriate way" and to her alleged behavior towards Aric. Thus, it was argued, "Jesse R's testimony would have been powerful and compelling in bolstering the Defendant's and Aric A's testimony." Nowhere in the moving papers did the defense allege Katie falsely accused Jesse of inappropriate sexual behavior, or that such a false accusation was erroneously excluded at trial, which makes Hatton's arguments on appeal all the more puzzling.

Hatton's motion for new trial was denied on the day of sentencing. The trial court referenced defense counsel's procedural violations by stating, "[T]he Court did consider [section] 782, but that was not the primary basis for the Court's ruling." It went on to explain the excluded evidence "would have been in fact even cumulative [because] we already had allowed the touching of the other boy. We had already the admission of the victim that she had not been truthful previously, and we had the [section] 352 issue. The

14.

prejudicial effect – this so totally outweighed the probative value of such…. [A]s I said, the Court could have applied this as a sanction for not complying with [section] 782. That wasn't the main issue here. The main issue was, this was not impeachment – proper impeachment. This was evidence of what might have been some prior sexual conduct of a child of such tender age…. As I said, I think the prosecutor briefed it very well, and the Court made its ruling at the trial. The Court stands by that ruling."

We note the lower court made a clear record throughout the trial of its concern over what it perceived as an improper focus on the victim's prior sexual behavior and the implication of her "promiscuity."

Analysis

"Evidence of the sexual conduct of a complaining witness is admissible in a prosecution for a sex-related offense only under very strict conditions." (*People v. Fontana* (2010) 49 Cal.4th 351, 362 (*Fontana*).) The admissibility of such evidence is governed by two statutes, sections 782 and 1103, which together provide a narrow exception to the general rule of exclusion. (*Id.* at pp. 362-363; *People v. Chandler* (1997) 56 Cal.App.4th 703, 707 (*Chandler*).) Section 1103 bars the admission of "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct," but allows the use of "evidence offered to attack the credibility of the complaining witness as provided in Section 782." (§ 1103, subd. (c)(1) & (5).)

Section 782 allows evidence of prior sexual behavior to be used for purposes of impeachment if the information is relevant to the credibility of the alleged victim. (§ 782, subd. (a).) Since the victim's credibility is frequently at issue in the prosecution of a sex crime, the statute contains several procedural hurdles. (*Chandler*, *supra*, 56 Cal.App.4th at pp. 707-708). "'Great care must be taken to insure that this exception to the general rule barring evidence of a complaining witness' prior sexual conduct … does not impermissibly encroach upon the rule itself and become a "back door" for admitting

15.

otherwise inadmissible evidence.'" (*Fontana*, *supra*, 49 Cal.4th at p. 363, quoting *People v. Rioz* (1984) 161 Cal.App.3d 905, 918-919.)

Defendants who wish to invoke the section 782 exception are required to submit a written motion "stating that the defense has an offer of proof of the relevancy of evidence of the sexual conduct of the complaining witness proposed to be presented and its relevancy in attacking the credibility of the complaining witness." (§ 782, subd. (a)(1).) The motion must be accompanied by an affidavit, filed under seal, containing the offer of proof. (*Id.*, subd. (a)(2).) "If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury, if any, and at the hearing allow the questioning of the complaining witness regarding the offer of proof made by the defendant." (*Id.*, subd. (a)(3).) At the hearing, the defendant must convince the court that the evidence is relevant under section 780 and is not inadmissible under section 352. If the requisite showing is made, the court will issue an order specifying what evidence may be introduced and the nature of the questions to be permitted. (*Id.*, subd. (a)(4).)

"[T]he credibility exception has been utilized sparingly, most often in cases where the victim's prior sexual history is one of prostitution." (*Chandler*, *supra*, 56 Cal.App.4th at p. 708.) Earlier decisions found that a victim's prior sexual experiences had no probative value in situations involving incest and child molestation. (E.g., *People v. Fritts* (1977) 72 Cal.App.3d 319, 327.) Section 782 was amended in 1987 to expressly apply to sexual crimes against children (*People v. Harlan* (1990) 222 Cal.App.3d 439, 447), but the exception is still extremely limited in that context. (See *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 [in a child molestation case involving oral copulation and sodomy, evidence of the victim's exploitation by other perpetrators is relevant to the credibility of the victim's testimony describing the charged offenses "in order to cast doubt upon the conclusion that the child must have learned of these acts through the defendant."].)

16.

Case law recognizes a distinction between the victim's prior sexual behavior and their history of making false accusations, which is why the trial court allowed the evidence pertaining to Aric but not Jesse. Where past conduct in the form of false statements or complaints about sexual activity is sought to be introduced as impeachment evidence, rather than to prove the victim's willingness to engage in sexual conduct, the provisions of section 782 do not apply. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456 (*Tidwell*); see §1103, subd. (a)(1).) "Even though the content of [the false accusation] has to do with sexual conduct, the sexual conduct is not the fact from which the jury is asked to draw an inference about the witness's credibility. The jury is asked to draw an inference about the witness's credibility from the fact that she stated as true something that was false." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 335 (*Franklin*).)

Relying on cases such as *Tidwell* and *Franklin*, Hatton argues (1) "Evidence Code section 782 did not operate to exclude evidence of Katie's false accusation against Jesse" and (2) "Evidence Code section 1103 therefore made Katie's false accusation against Jesse admissible to prove nonsexual conduct of the victim." At the risk of overemphasizing the point, we say once more that the trial court did not exclude any false accusation evidence in relation to Jesse.

Respondent's briefing addresses Hatton's arguments with commendable tact. Nevertheless, Hatton's reply brief inexplicably contains the following statement: "Respondent ignores that the gist of Kyle's evidence was [Katie's] false accusations, *not* her conduct." (Original italics, footnote omitted.) Hatton also claims the excluded evidence was admissible as proof of habit under section 1105. The latter argument is as invalid as the former. "Custom or habit involves a consistent, semiautomatic response to a repeated situation." (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926, citations omitted.) The evidence regarding Katie's alleged touching of Jesse's penis was obviously insufficient for purposes of section 1105.

17.

Since all of his arguments are based on a non-existent proffer of false accusation testimony, Hatton has forfeited any potentially cognizable claims with respect to the evidence that was actually excluded by the trial court's ruling. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; accord, *People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2.) The forfeiture does not alter the end result, however, because the trial court's ruling would otherwise be affirmed on two separate grounds: failure to comply with section 782 and the court's proper exercise of discretion under section 352.

We agree with the prosecution's argument below that much of defense counsel's cross-examination of the victim would never have occurred if the strictures of section 782 had been followed. By circumventing those statutory procedures, Hatton's attorney manufactured the very issue Jesse's testimony was intended to address, i.e., the impeachment of Katie based on her denial that she touched his penis. "[T]he right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295.) "Relevant evidence may, for example, be excluded on account of a defendant's failure to comply with procedural requirements." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 42.) Standing alone, Hatton's procedural violations were sufficient to justify the exclusion of his proposed evidence.

Exclusion of the evidence was also justified under section 352. (*People v. Smithey* (1999) 20 Cal.4th 936, 970.) A ruling on the admissibility of prior sexual conduct will be overturned on appeal only if the appellant can establish an abuse of discretion, meaning he must show the trial court exercised its discretion an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10; *Chandler*, *supra*, 56 Cal.App.4th at p. 711.) Whether or not Katie touched Jesse's penis was a collateral issue, relevant only for the purpose of

lending credence to Hatton's story about her fondling him in his sleep, and arguably cumulative of the testimony given by Aric. Insofar as the evidence spoke to the victim's credibility, the probative value was significantly diminished by the fact that Katie impeached herself multiple times on re-direct examination. Finally, the anticipated use of the evidence was totally inconsistent with the traditionally narrow application of section 782, as established through case law, and was fairly deemed to be more prejudicial than probative. We have no criticism of the manner in which the trial court exercised its discretion on this issue.

Hatton's constitutional claims are forfeited because he did not raise them at trial. (§ 353, subd. (a); *People v. Partida* (2005) 37 Cal.4th 428, 433-434 (*Partida*).) An exception to the rule of forfeiture exists "when 'the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to the court, had the additional legal consequence of violating the Constitution.'" (*People v. Tully* (2012) 54 Cal.4th 952, 979-980.) This exception is not available to Hatton because his constitutional claims are based solely upon the rejection of an offer of proof that was never made. "A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, *supra*, 37 Cal.4th at p. 435.)

Appellant does not explain how his inability to present the evidence that was actually considered and excluded resulted in a violation of his constitutional rights. We will not attempt to craft such arguments on his behalf. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546 [reviewing courts do not serve as "backup appellate counsel," or make the parties' arguments for them].) Furthermore, the court's decision was based on well-established exclusionary rules under sections 782 and 1103, and a discretionary section 352 analysis. We find no error in the court's application of those statutes. "Although a defendant has the general right to offer a

19.

defense through the testimony of his or her witnesses, 'a state court's application of ordinary rules of evidence – including the rule stated in Evidence Code section 352 – generally does not infringe upon this right." (*People v. Linton* (2013) 56 Cal.4th 1146, 1183, citations omitted; accord, *People v. Abilez* (2007) 41 Cal.4th 472, 503.)

**Expert Witness Testimony re: Child Sexual Abuse Accommodation Syndrome**

Hatton's next assertion of error relates to the testimony of Anthony Urquiza, Ph.D. Dr. Urquiza is an expert in what is known as child sexual abuse accommodation syndrome (CSAAS). He was permitted to testify about this topic on the fifth day of trial, shortly before the conclusion of the prosecution's case-in-chief.

Appellant "urges this Court to reconsider the admissibility of CSAAS evidence for any purpose." Next, he contends the testimony of Dr. Urquiza was not admissible because defense counsel's "attack on Katie's general credibility did not open the door" to such evidence. Finally, he claims admission of the evidence constituted an abuse of the court's discretion under section 352 and deprived him of his constitutional right to due process and a fair trial. We reject each argument for the reasons stated herein.

Background

According to Dr. Urquiza, the concept of CSAAS originated in a scholarly article published in 1983 by a psychiatrist named Dr. Roland Summit. The piece was intended for therapists who were or would be treating child victims of sexual abuse, with the goal of dispelling certain misunderstandings and myths about these individuals. Through his own clinical experience and research over the past two decades, Dr. Urquiza has generally found the tenets of CSAAS, as described in the original article, to be accurate. He has testified as a CSAAS expert in over 200 criminal cases.

Dr. Urquiza's testimony identified and explained the five components of the syndrome: secrecy, a sense of helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction. Each component represents a misconception many people supposedly share concerning child molestation and sexual abuse.

20.

Dr. Urquiza claimed to be unfamiliar with the facts of the case, and testified to having no opinions regarding the veracity of the underlying allegations.

It suffices to summarize the main points of the expert's testimony as follows: (1) Child victims of sexual abuse often keep the abuse a secret, despite a common misconception that the natural response is to "tell right away." Children are most often abused by someone they know, and may even care for that person on a certain level. It is not uncommon for the perpetrator to pressure the child to remain silent through intimidation, threats, or manipulation. (2) The victim often feels helpless in a way that may seem irrational to an outside observer, the misconception being that a typical response would be to run away or find some other means of protecting themselves. (3) Entrapment and accommodation refer to the victim's feelings of being stuck or trapped in the situation. The victim often tries to cope with the experience by suppressing the bad feelings, which can result in a flat affect. When the child eventually discusses the abuse, he or she may do so without showing any emotion. (4) Delayed and unconvincing disclosure refers to the gradual and sometimes inconsistent revelations of the abuse, despite the common misperception that a child would immediately and fully recount the traumatic events. (5) Retraction refers to the recanting of a truthful disclosure about the molestation. Although the original article describes retraction as a "common" behavior, modern research suggests it occurs in a minority of cases.

Analysis

The California Supreme Court has recognized the admissibility of CSAAS testimony to rebut common misconceptions a jury may hold about how child victims react to sexual abuse. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 (*McAlpin*); see also, *People v. Brown* (2004) 33 Cal.4th 892, 905-906.) Hatton acknowledges this precedent, but argues the reasoning behind *McAlpin, supra,* is no longer compelling in light of the widespread publicity child molestation cases have received in recent years. He levels the same criticism against our decision in *People v. Patino* (1994)

21.

26 Cal.App.4th 1737 (*Patino*), telling us "the world has changed" and that any false stereotypes in existence two decades ago are no longer present in today's society. Times do change, but the opinions of our high court are not issued with expiration dates. We are bound to follow those decisions, and therefore reject Hatton's more generalized challenge to the admissibility of CSAAS evidence. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["The decisions of this court are binding upon and must be followed by all the state courts of California"]; *People v. Perez* (2010) 182 Cal.App.4th 231, 245 (*Perez*).)

Expert testimony concerning CSAAS is admissible to rehabilitate a child victim's credibility when the defense suggests an aspect of the victim's behavior, such as secrecy or delayed reporting, is inconsistent with their testimony about the molestation. (*McAlpin*, *supra*, 53 Cal.3d at p. 1300; *Perez*, *supra*, 182 Cal.App.4th at p. 245.) To safeguard against improper use of CSAAS evidence, the expert's testimony must be addressed to specific myths or misconceptions suggested by the evidence that is before the jury. (*People v. Housley* (1992) 6 Cal.App.4th 947, 955 (*Housley*).) The trial judge must also instruct that such testimony is not proof the victim's allegations are true, and is admissible only for the purpose of showing that the victim's behavior was not necessarily inconsistent with conduct normally exhibited by someone who has been molested. (*Ibid.*; see *Patino*, *supra*, 26 Cal.App.4th at p. 1744 ["It is beyond dispute that CSAAS testimony is inadmissible to prove that a molestation actually occurred."].)

It is the prosecution's burden to identify the myth or misconception the proposed CSAAS testimony is intended to rebut. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).) "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is inconsistent with the finding of molestation. It is sufficient if the victim's credibility is placed in issue due to the paradoxical behavior, including a delay in reporting a molestation." (*Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.) The admissibility of

22.

evidence is ultimately subject to the discretion of the trial court, and its decision to admit or exclude the expert testimony "'will not be disturbed on appeal unless a manifest abuse of discretion is shown.'" (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.)

Hatton claims the prosecution failed to carry its threshold burden because Dr. Urquiza's testimony did not address a specific myth or misconception suggested by the evidence. We disagree. The record discloses several instances where the questions posed to Katie on cross-examination appeared designed to exploit the very same misconceptions the CSAAS literature purports to dispel. For example, Hatton's attorney asked Katie to confirm her parents taught her "that if somebody treated you badly, that you're supposed to stop [them] or tell somebody, or both." After she responded affirmatively, counsel followed up with questions such as, "You've always tried to do that; isn't that right?" and "You've always tried to do what your parents told you to, right?" Katie was also asked if "anybody anywhere in your life ever told you that if anybody touched you inappropriately that you should either say something or stop it?" This line of questioning, and other inquiries concerning the victim's comfort level in confiding things to her parents, teachers, and relatives, can reasonably be connected to the "tell right away" myth under the secrecy component of CSAAS.

Katie's testimony described several instances of abuse which occurred while her relatives were nearby or even in the same room. The defense challenged the plausibility of her allegations by insinuating she could have easily prevented the abuse by avoiding Hatton or calling out for help. The following questions on cross-examination illustrate this tactic: "[Y]ou knew whenever he was closing the door what was going to happen, right? ["Yes."] And then you tried to get out the door, right? ["No."] You tried to get out and get away from him, right? ["No"]." A less subtle example related to the Disneyland incident: "And you didn't call out to your grandparents, why again?" These attacks against the victim's credibility were highly relevant to the second CSAAS component

23.

(feelings of helplessness), which addresses the victim's failure to run away, fight back, or find some other way to stop the abuse.

The victim was cross-examined at length about the timeliness of her disclosure and failure to reveal the extent of the abuse all at once. This is the classic justification for allowing CSAAS testimony, as it speaks to the element of delayed and unconvincing disclosure. (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.) We highlight these examples not to suggest defense counsel's questions were improper, but to show Hatton's argument about the supposed lack of evidence relating to the components of CSAAS is simply not supported by the record. Thus, the trial court did not err by concluding the state of the evidence at the time of Dr. Urquiza's testimony fulfilled the threshold requirement for admissibility.

Hatton alternatively contends the testimony should have been excluded pursuant to section 352. Section 352 requires trial courts to balance the probative value of relevant evidence against the potential for unwarranted delay, juror confusion, and undue prejudice. "'Prejudice' in the context of Evidence Code section 352 refers to the possibility of misuse of the evidence [i.e.,] use of the evidence by the trier of fact for a purpose for which the evidence is not properly admissible." (*People v. Hoze* (1987) 195 Cal.App.3d 949, 954.)

Dr. Urquiza's testimony was brief, particularly on direct examination. Outside of establishing the expert's qualifications, the prosecution asked few questions beyond what was necessary to elicit a general explanation of the five CSAAS components. The testimony itself could be described as perfunctory, since Dr. Urquiza did little more than summarize Dr. Summit's original CSAAS article and provide generalized explanations about the syndrome's characteristics. He did, however, confirm that sexual abuse sometimes occurs even when other people are in close physical proximity to the victim and perpetrator.

24.

The CSAAS evidence had probative value for the purpose of rehabilitating Katie's credibility in relation to those behaviors the defense sought to portray as inconsistent with her allegations of abuse. The potential for juror confusion and/or prejudice was minimized by the fact that Dr. Urquiza testified to having no knowledge of the matters in dispute. His statements on this point were unequivocal: "I don't know what happened in this case. Testimony whether a particular child is abused or not or a particular person was guilty or innocent would be improper. I have no intention to provide an opinion like that." The expert also said that the CSAAS model is not a diagnostic tool for determining whether or not abuse has occurred. There is no reason to believe the jurors did not understand Dr. Urquiza was explaining behavior common to sexual abuse victims in general, rather than offering an opinion about the credibility of the complaining witness.

In addition, the trial court instructed the jury pursuant to CALCRIM No. 1193: "You have heard testimony from Dr. Urquiza regarding child sexual abuse accommodation syndrome. [¶] Dr. Urquiza's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not Katie Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The inclusion of this instruction, which is mandatory in cases where CSAAS evidence is admitted, further minimized any danger of the jury misconstruing the expert's testimony as corroboration of the victim's claims. (See *Housley*, *supra*, 6 Cal.App.4th at p. 959.)

For the reasons discussed above, there is no basis upon which to conclude the trial court abused its discretion by permitting the challenged CSAAS evidence. With respect to Hatton's federal constitutional claims, this court has previously held that the introduction of CSAAS testimony does not by itself violate a defendant's due process rights, including the right to a fair trial. (*Patino*, *supra*, 26 Cal.App.4th at p. 1747.) Hatton submits the admission of Dr. Urquiza's testimony "deprived [him] of due process

25.

and a fair trial for the same reasons the evidence was inadmissible under Evidence Code section 352." Finding no error in the trial court's section 352 analysis, we reject Hatton's constitutional claims.

**CALCRIM No. 1193**

As a companion argument to the CSAAS issue, Hatton alleges instructional error in the use of CALCRIM No. 1193. The instruction is recited verbatim in our previous discussion. Hatton contends CALCRIM No. 1193 is inherently argumentative, favors the prosecution, and misleads jurors in terms of the manner in which they are allowed to consider expert witness testimony about CSAAS. No such objection was raised at the time of trial, meaning the issue has arguably been forfeited. (*People v. Welch* (1999) 20 Cal.4th 701, 757 [forfeiture applies to complaints that an instruction is "too general, lacks clarity, or is incomplete"].) However, the interests of judicial economy are better served by exposing the lack of merit in Hatton's claim rather than entertaining a debate over whether the issue was preserved for appeal. (See Pen. Code, § 1259 [instructional errors are reviewable without objection below to the extent they affect a defendant's substantial rights].)

Jury instructions must be neutral and non-argumentative. (*People v. Wright* (1988) 45 Cal.3d 1126, 1135.) An instruction is argumentative if it invites the jury to draw inferences favorable to one party over the other from specified items of evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) "In assessing a claim of instructional error or ambiguity, we consider the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled." (*People v. Tate* (2010) 49 Cal.4th 635, 696.)

The challenge here pertains to the final sentence of the CSAAS instruction, which we repeat for ease of reference: "You may consider [the CSAAS] evidence only in deciding whether or not Katie Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Appellant states his position thusly: "[T]he instruction told jurors they could consider CSAAS evidence 'only' in deciding whether Katie's conduct was consistent 'with the conduct of someone who has been molested….' CALCRIM No. 1193 failed to instruct jurors they also could consider CSAAS evidence in deciding whether Katie's conduct was *in*consistent with the conduct of someone who has been molested…. [The instruction] was argumentative and impermissibly one-sided because it told jurors they could not consider any of Katie's conduct that was inconsistent with someone who has been molested. Accordingly, reversal is required." (Fn. omitted, original italics.)

Hatton's argument is flawed. His partial quotation of the instruction conveniently omits the language which told the jury it could rely on Dr. Urquiza's testimony only in deciding "whether *or not* Katie Doe's conduct was not inconsistent with the conduct of someone who has been molested…." (Italics added.) The disjunctive language neutralizes the tone of the instruction.

Our analysis is also guided by the rule that jurors are presumed to be intelligent persons "capable of understanding and correlating all jury instructions which are given." (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111 (*Martin*), internal quotation marks omitted.) Hatton's arguments presume the opposite, i.e., that the jury was not smart enough to understand the meaning of "whether or not" and "not inconsistent." Use of the term "not inconsistent" in CALCRIM No. 1193 is faithful to the seminal authority on the issue. The commentary to the instruction indicates that it is derived from *People v. Bowker*, *supra*. The *Bowker* opinion uses the double negative phrasing on four separate occasions, most notably in its ultimate holding: "The evidence is admissible *solely* for the purpose of showing that the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested." (*Bowker*, *supra*, 203 Cal.App.3d at pp. 392, fn. 8, 393-394, original italics.)

"'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*Martin*,

27.

*supra*, 78 Cal.App.4th at p. 1112, quoting *People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258.) The instruction at issue requires less interpretation than simple recognition of every word contained in its final sentence. The jury was told it could consider Dr. Urquiza's CSAAS testimony only for the purpose of deciding "whether or not Katie Doe's conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." This statement conveyed the option to find Katie's behavior to either be consistent or inconsistent with the conduct of someone who has been sexually abused.

We reject both grounds for reversal proposed by appellant. He first contends the instruction is argumentative and favors the prosecution, which we have explained is not a valid argument. Though somewhat awkwardly worded, the instruction is objectively neutral. The second argument suggests the instruction is confusing or misleading. "[I]f defendant believed the instructions required clarification or modification, it was incumbent upon him to request it." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140.) He did not do so. In any event, Hatton fails to rebut the presumption that the jury understood the instruction and applied it correctly. Therefore, we do not find it reasonably likely that the jury was misled and/or that prejudice occurred.

**Prior Sexual Misconduct Evidence (§ 1108)**

The prosecution was permitted to introduce evidence at trial of inappropriate sexual behavior by Hatton towards Katie's older brother, Patrick. The evidence was admitted pursuant to section 1108. Hatton presents a facial challenge to the constitutionality of section 1108 and separately argues the trial court erred by allowing the victim's brother to testify as he did at trial.

According to the California Supreme Court, section 1108 is constitutionally valid. (*People v. Falsetta* (1999) 21 Cal.4th 903, 912-922 (*Falsetta*). Hatton acknowledges we are in no position to hold otherwise, but purports to raise his facial challenge in order to preserve the issue for federal appellate review. Given his representations, it is

28.

unnecessary to retread the same ground covered by numerous decisions in the past. (E.g., *Falsetta*, *supra*, 21 Cal.4th at pp. 907, 916–922 [no due process violation]; *People v. Fitch* (1997) 55 Cal.App.4th 172, 182-184 [no equal protection violation].) Pursuant to the doctrine of stare decisis, we summarily reject Hatton's facial challenge to the constitutionality of the statute. His remaining arguments are unavailing.

Background

Katie's brother, Patrick, is older than her by approximately three years and eight months. He was 16 years old at the time of trial. Hatton, who is Patrick's uncle, was 21 years old at the time of trial. The difference in age between Hatton and Patrick is approximately five years and ten months.

Over the objection of defense counsel, Patrick testified to prior uncharged acts of molestation committed against him by Hatton when he was approximately 7 or 8 years old. Hatton would have been about 13 or 14 at the time. Based on these estimates, and Patrick's birthdate, the alleged incidents occurred roughly sometime around 2004. Katie was molested by Hatton from approximately 2008 through 2011. Therefore, the amount of time between the alleged misbehavior involving Patrick and the abuse of Katie was approximately four or five years.

Patrick claimed the inappropriate conduct happened only two or three times, and always on occasions when he was visiting the home of his grandparents, i.e., Hatton's mother and father. He remembered being alone in the house with Hatton, and Hatton touching his penis over the top of his pants in an attempt to arouse him. As Hatton did this, he asked Patrick if he could "suck" his penis. Patrick pushed Hatton away and told him to stop. Hatton backed off after a failed effort to cajole his nephew. Patrick recalled, "[H]e told me that all the cool kids were doing that at that time, and he just tried to make it seem like it was okay to do that … [and I told him] I was not okay with that."

Hatton repeated the same behavior on one or two subsequent occasions, with Patrick responding the same way each time. Every such incident, including the first one,

29.

happened in the downstairs guestroom of Hatton's parent's house. Patrick did not acquiesce to Hatton's propositions. After his final refusal to participate in the improper behavior, Hatton stopped propositioning him.

Patrick did not see Hatton behave inappropriately with Katie, nor did he reveal to anyone what Hatton had done to him until shortly after Katie came forward with her allegations. When asked why he kept the information a secret, Patrick replied, "Because I liked my Uncle Kyle so much that I didn't want to ruin the relationship and not be able to see him anymore…. We'd play video games and swords. I was always hanging around him."

Analysis

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*).) This general rule is codified in section 1101, subdivision (a). The enactment of section 1108, which occurred nearly 20 years ago, eliminated the application of section 1101 in cases involving sex crimes. (*Falsetta*, *supra*, 21 Cal.4th at p. 911; *People v. Britt* (2002) 104 Cal.App.4th 500, 505 (*Britt*).)

Section 1108, subdivision (a) provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." The statute applies to both charged and uncharged offenses. (*Villatoro*, *supra*, 54 Cal.4th at p. 1161-1162.) A "sexual offense" includes lewd and lascivious conduct with children under the age of 14 years as proscribed by Penal Code section 288, and other crimes such as sexual battery under Penal Code section 243.4. (§ 1108, subd. (d)(1)(A).)

By removing the restrictions set forth in section 1101, section 1108 permits the jury to consider evidence of prior sexual offenses "*for any relevant purpose,* subject only

30.

to the prejudicial effect versus probative value weighing process required by section 352." (*Britt*, *supra*, 104 Cal.App.4th at p. 505, original italics, citations and quotation marks omitted.) Evidence is relevant if it has a tendency to prove or disprove a disputed fact. (§ 210.) Jurors may therefore consider prior sexual misconduct, and the propensity to engage in such behavior, for purposes of evaluating the credibility of the defendant and the complaining witness. (*Falsetta*, *supra*, 21 Cal.4th at p. 911.)

A challenge to the admission of propensity evidence pursuant to sections 1108 and 352 is reviewed under the deferential abuse of discretion standard described in our previous discussions. (*People v. Robertson* (2012) 208 Cal.App.4th 965, 991 (*Robertson*).) Hatton does not dispute the applicability of section 1108 to Patrick's testimony, but argues the evidence should have been excluded under section 352. To determine the strength of his argument, we consider five factors which "stand out as particularly significant in an Evidence Code section 1108 case." (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*).) "These factors are (1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show the defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time." (*Ibid.*)

The strength of the first factor is balanced against the dangers of prejudice and undue consumption of time as measured by the second through fifth factors. (*Nguyen*, *supra*, 184 Cal.App.4th at p. 1117.) Although Hatton views the offenses described in Patrick's testimony as dissimilar to his crimes against Katie, we see numerous parallels. Both victims were prepubescent youths who were approximately the same age at the time

they were first molested. They also happened to be the children of Hatton's half-sister. Hatton used a familial position of trust to facilitate his behavior and committed the offenses in the same location (his parents' home).

Hatton emphasizes one victim was a boy and the other a girl. However, the modus operandi revealed the same type of incestuous and pedophilic tendencies. Patrick's testimony was also important for purposes of helping the jury make credibility determinations about Hatton and Katie, since both testified at trial. The testimony had significant probative value for all of these reasons.

Under the second factor, it is difficult to imagine any juror perceiving Hatton's alleged behavior towards Patrick as being more inflammatory than the evidence relating to Katie. Though condemnable, the transgressions involving his nephew were less egregious than the prolonged molestation of his niece. Therefore, we conclude the evidence of the charged offenses was stronger and more provocative than the propensity evidence.

We consider third whether the uncharged conduct was remote or stale. On this point, Hatton claims the incidents with Patrick were "extremely remote" and constituted "decade-old evidence." The argument is unavailing for several reasons, not the least of which being mathematical inaccuracy. Hatton continually refers to a ten-year period from the date of the prior offense to the time of trial, but the record suggests he is off by at least a year.

Contrary to appellant's apparent belief, ten years is not a special number in the context of section 1108. "No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284 (*Branch*).) As we noted in *People v. Robertson*, *supra*, "[n]umerous cases have upheld admission pursuant to Evidence Code section 1108 of prior sexual crimes that occurred decades before the current offenses." (*Robertson*, 208 Cal.App.4th at p. 992.) Moreover, the relevant time period is measured by the gap

between the offenses, which was only about four or five years in this case. (See *Falsetta*, *supra*, 21 Cal.4th at p. 917; *Branch, supra,* 91 Cal.App.4th at p. 285.) The interval between the victimization of Patrick and Katie was not short, but that did not objectively outweigh the probative value of the evidence.

The fourth element addresses the concern that a jury may be so outraged by the uncharged offense that it becomes motivated to convict on the current charge in order to punish the defendant for his prior conduct. Juror confusion is a similar problem, i.e., the risk of the jury losing focus of the primary issues they have been called upon to decide in the case. In that respect, there is overlap with the fifth factor, undue consumption of time. These considerations did not strongly weigh against the admissibility of Patrick's testimony. The propensity evidence was brief, easily distinguishable from the direct evidence of guilt, and less inflammatory than the accusations behind the current charges.

Pursuant to the forgoing analysis, we do not find an abuse of discretion under the controlling standards for admissibility. Thus, there was no error under state law. Hatton's as-applied challenge on constitutional due process grounds fails for this reason. "To show a violation of due process, a defendant must show that the statute, as applied, offended a principle of justice so rooted in the traditions and consciousness of the country that it is considered fundamental." (*People v. Manning* (2008) 165 Cal.App.4th 870, 877.) The requisite showing has not been made. Simply stated, Hatton received a fair trial.

**Cumulative Error**

Hatton argues the cumulative effect of the errors alleged on appeal requires reversal of his convictions. The claim is untenable, as there are no errors to cumulate. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 568.)

**Assessments and Fees**

Appellant and respondent both request correction of a sentencing error concerning a monetary assessment, and clarification of a discrepancy in the record about a fee. The

first problem amounts to an unauthorized sentence, while the latter is appropriately classified as a clerical mistake. We have jurisdiction to resolve both issues. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [clerical errors]; *People v. Smith* (2001) 24 Cal.4th 849, 852-854 [unauthorized sentences].)

In relevant part, the trial court's imposition of sentence is stated in the reporter's transcript as follows: "Pursuant to Government Code Section 7373, $50.00…." Cross-referencing the clerk's transcript, we find both the minute order and abstract of judgment show a $50 "Criminal Conviction Assessment" pursuant to Government Code section 70373. The parties believe the trial court intended to rely upon Government Code section 70373, but miscalculated the dollar amount.

"When a clerk's transcript conflicts with a reporter's transcript, the question of which of the two controls is determined by consideration of the circumstances of each case." (*People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2.) Whichever is entitled to greater credence, "'"because of its origin and nature or otherwise,"'" will be credited. (*People v. Beltran* (2013) 56 Cal.4th 935, 945, fn. 7.) Since the Government Code does not contain a section "7373," it is most likely that a typographical error resulted in the omission of a zero in the reporter's transcript, and that the trial judge actually said "70373." It is also possible the trial judge misspoke, but either way we are confident the minute order and abstract of judgment accurately reflect the court's intentions. We note the sentence documented in the clerk's transcript matches up with the probation report, which erroneously recommended an assessment under Government Code section 70373 in the amount of $50 pursuant to the calculation of $10 for each of Hatton's five convictions.

Government Code section 70373 provides for the imposition of a court facilities assessment, which is also commonly known as a "criminal conviction assessment." (See Judicial Council Forms, form CR-290 (rev. Jan. 1, 2012).) "To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on every conviction

for a criminal offense… . The assessment shall be imposed in the amount of thirty dollars ($30) for each misdemeanor or felony… ." (Gov. Code, § 70373, subd. (a)(1).) The fee is mandatory, and applies to "each count of which a defendant is convicted." (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483; *People v. Woods* (2010) 191 Cal.App.4th 269, 272-273.) Hatton stood convicted of five counts at the time of sentencing, and was thus subject to a mandatory assessment of $150 pursuant to Government Code section 70373, subdivision (a)(1). The judgment will be modified accordingly.

There is a second discrepancy between the reporter's transcript and the clerk's transcript in relation to an administrative fee. The reporter's transcript reads, "You will pay an administrative fee pursuant to 1203.1(b)(h) in the amount of $725." This conflicts with the minute order and abstract of judgment, both of which reflect an administrative collection fee of $75 imposed pursuant to Penal Code section 1203.1b, subdivision (h). Reference to section "1203.1(b)(h)" would be nonsensical in this context, whereas Penal Code section 1203.1b, subdivision (h) authorizes an administrative fee in an amount not to exceed $75. Here, too, the clerk's transcript is consistent with the recommendation of the probation officer. Following our earlier analysis, we conclude the reporter's transcript contains typographical errors, and the abstract of judgment accurately reflects the trial court's intention to impose a $75 fee pursuant to Penal Code section 1203.1b, subdivision (h). The fee will remain as ordered.

## DISPOSITION

The oral pronouncement of judgment is modified to impose a $30 court facilities assessment as to each count pursuant to Government Code section 70373, subdivision (a)(1), thereby resulting in a total assessment of $150, and a $75 administrative fee pursuant to Penal Code section 1203.1b, subdivision (h). In all other respects, the judgment is affirmed. The clerk of the superior court is directed to prepare an amended

abstract of judgment and to send a certified copy of same to the Department of Corrections and Rehabilitation.

_____
                                                                    Gomes, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Poochigian, J.